**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
**www.flmb.uscourts.gov**

In re:

Mojo Brands Media, LLC                                      Case No.
                                                                      6:15-bk-03871-CCJ

     Debtor.

_____/
Trustee, Gene T. Chambers,

     Plaintiff,

                                                                      Adv. No.
v.                                                                    6:15-ap-00143-CCJ

Bomojo Investment, LLC, Richard
W. Botnick, individually, and
Richard S. Botnick, individually.

     Defendants.

_____/

**TRUSTEE'S FIRST AMENDED COMPLAINT**

     Plaintiff, **GENE T. CHAMBERS, TRUSTEE** ("Plaintiff"), sues the Defendants,

**BOMOJO INVESTMENT, LLC** ("Bomojo"), **RICHARD W. BOTNICK**, **individually**

("RW Botnick") and **RICHARD S. BOTNICK**, **individually** ("RS Botnick") and alleges:

**The Parties, Jurisdiction and Venue**

     1.      Bomojo is a New Hampshire Limited Liability Company that was formed for the

limited purpose of providing financing for, and to holding equity in, Mojo Brands Media, LLC

(the "Debtor"), which at all times material hereto, conducted business in Orlando, Florida.

Bomojo purports to be a creditor, and is a party-in-interest, in the Debtor's Chapter 7 bankruptcy.

Bomojo is also simultaneously: (i) a 19% equity owner of the Debtor, which holds warrants to

increase its ownership share to 25%; (ii) a "manager" of the Debtor pursuant to a management

agreement between the Debtor and Bomojo; (iii) the "Investor" under the Debtors' operating agreement which gives it the right to appoint three managers to the Debtor's board of managers; and (iv) an insider of the Debtor within the meaning of § 101 of the Bankruptcy Code.

2.      RW Botnick is a resident of New Hampshire.  At all times material hereto, RW Botnick was, simultaneously, the manager of Bomojo and the Chairman and a manager of the Debtor.  RW Botnick is *sui juris*.

3.      RS Botnick is a resident of New Hampshire and the son of RW Botnick.  At all time material hereto, RS Botnick was a member of the Board of Directors[sic] of Bomojo and a manager of the Debtor.  RS Botnick is *sui juris*.

4.      The Debtor is a Florida Limited Liability Company that was a media production company, which consisted of the ownership and operation of numerous television and alternate media shows and projects which were telecast from a studio located on the campus of Full Sail University, and which at all times material hereto, conducted business in Orlando, Florida.  The Debtor filed a voluntary petition under Chapter 7, Title 11, United States Code on May 1, 2015 in the United States Bankruptcy Court of the Middle District of Florida, Orlando Division.

5.      The Plaintiff is the duly appointed Chapter 7 Trustee of Debtor's bankruptcy estate.

6.      The Court has jurisdiction pursuant to 28 U.S.C. 1334.  This is a core proceeding under 28 U.S.C. Section 157(b).

7.      Venue is proper in this Court pursuant to 28 U.S.C. 1409.

**Introduction**

8.      The instant action revolves around the Defendants' wrongful actions and breaches of fiduciary duty in causing the closure of Debtor's business, to the detriment of all of its creditors, at a time when the Debtor was current on its monetary obligations to over 80% of its

2

creditors, including Bomojo, and after the Debtor's president, Marc Jaromin ("Jaromin"), had arranged for financing which would have provided for payment of the remaining 20% of the Debtor's creditors.  While the Defendants each hold a fiduciary duty to the Debtor and its creditors, they all participated in activities which were designed to prefer only Bomojo, so that it could grab all of Debtor's cash and receivables on account of Bomojo's purported claim against Debtor.  These actions literally choked off the Debtor from all cash flow and resulted in the termination of Debtor's business, destroying the going-concern value and goodwill of the Debtor, and leaving no monies available to pay unsecured claims and employee wages, which the Defendants refused to permit to be paid.

9.      Accordingly, the Amended Complaint seeks money damages against the Defendants for breach of fiduciary duty in an amount not less than $5,678,000 plus punitive damages (Count 5).  The Amended Complaint also seeks:  (i) to expunge Bomojo's claim and lien against the Debtor on the grounds that it is usurious and unenforceable under New York Law (Count 1), or have Bomojo's claim against the Debtor recharacterized as equity (Count 2) or equitably subordinated below the priority of all general unsecured claims (Count 3); and (ii) to obtain the turnover of all monies held by Defendant Bomojo which constitute proceeds of the Debtor's receivables (Count 4).

10.      The facts set forth in this Amended Complaint are based primarily upon the declaration of Marc Jaromin (the "Jaromin Dec."), which was filed in opposition to Bomojo's motion for relief from the automatic stay in the Debtor's bankruptcy case, and the exhibits annexed thereto.  A copy of the Jaromin Dec. is annexed hereto as Exhibit A.  References to exhibits in this Amended Complaint are to those exhibits attached to the Jaromin Declaration.

**Background**

11.      The Debtor was a media production company until the wrongful actions of the Defendants wrongfully caused the shutdown of Debtor's business on April 17, 2015.

12.      The Debtor's business consisted of the ownership and operation of numerous television and alternate media shows and projects which were telecast from a studio located on the campus of Full Sail University.

13.      Included among these projects were the production and distribution of:  (i) The Daily Buzz, which was a syndicated morning news program that aired in over 166 TV markets across the United States, providing fresh news, weather and the latest social media and entertainment trends; and (ii) Emotional Mojo, which was a multi-platform concept that empowered people to move forward and follow their dreams through the best of psychology, personal development, life coaching, and daily inspiration in a single Mojo brand.  The Debtor also provided production and integration sales services for other media companies.

**The Financing of Debtor**

14.      Since its formation, the Debtor has been undercapitalized.

15.      The Debtor's initial business plan anticipated $5 million in financing for, among other things, acquisition of the Daily Buzz, a television studio build-out at Full Sail University, and business operations.  The Debtor originally obtained a $2,500,000 bridge loan (the "Bridge Loan") from Valley Bank in Davenport, Iowa, which was used to acquire the Daily Buzz and for working capital.  However, approximately 45 days after funding of the Bridge Loan, Valley Bank was placed into receivership by the FDIC, and the Bridge Loan was called in.  (Jaromin Dec. At ¶ 5).

16.      On or about August 28, 2013, the Debtor obtained a $3,136,000 loan (the "Newtek Loan") from Newtek Small Business Finance, LLC ("Newtek"), which was: (i) secured

4

by a first priority blanket lien on all of Debtor's assets, and (ii) used to repay the Bridge Loan and provide further funds for the Debtor's capital projects. However, the $3,136,000 loan was less than the $5,000,000 sought under Debtor's original business plan. As a result, the Debtor reduced costs, scaled down its operations and began looking for additional financing or equity in the amount of approximately $800,000 - $1,200,000 (Jaromin Dec. at ¶6).

## The Introduction of Botnick to the Debtor

17.     In May 2014, the Debtor was introduced to RW Botnick, who was the president of Botnick/5 Ventures, Inc. ("Botnick/5"), a New Hampshire corporation. Botnick/5 portrayed itself as a small family fund made up of successful entrepreneurs, and contended that the Debtor needed an equity infusion, rather than additional debt. As a result, Botnick/5, through RW Botnick, offered to provide $800,000 to the Debtor as an equity infusion. After weighing this proposal, and being unable to obtain financing from other sources, the Debtor decided to move forward with the Botnick/5 equity proposal.

18.     However, shortly after agreeing to go forward with RW Botnick's proposed equity infusion, RW Botnick contacted Debtor and stated that an "internal structure issue" had been raised by his accountant which required a restructuring of the proposed funding. In a classic "bait and switch," RW Botnick insisted on changing the structure of the deal from a pure equity infusion to a loan, and Botnick/5 was replaced with Bomojo as the funder.

## The Bomojo Loan

19.     On or about July 14, 2014, Debtor entered into the $800,000 "Loan Agreement" with Bomojo (the "Bomojo Loan"). Under the Bomojo loan agreement (the "Bomojo Loan Agreement")(Exhibit A-1), Bomojo was required to loan $550,000 to the Debtor on the closing date, and $250,000 on the Delayed Draw Date (as defined in the Bomojo Loan Agreement),

which ultimately was to be funded in August 2014.  The loan was payable annually, interest only, until its maturity in 2019, when all outstanding principal and interest would be due.

20.     The Bomojo Loan is also secured by a blanket lien on all of Debtor's assets. While the Bomojo Loan Agreement states it is a "senior" secured loan, the loan was subordinate to the prior secured loan of Newtek, except with respect to accounts receivable.

21.     Even though the transaction was now structured as a loan, the Bomojo Loan continued to retain the essential elements of an equity infusion as originally intended.  For example:

> (i)     Bomojo received a 19% ownership interest in Debtor, with warrants which would allow its interest to increase to 25% for no consideration other than Bomojo's agreement to loan $800,000 to Debtor under the Loan Agreement;

> (ii)    RW Botnick was named "Chairman" of the Debtor's board of managers, which was expanded from three members to seven members, three of whom would be appointed by Bomojo, three of whom would be appointed by the Debtor's existing members, and one independent manager who would be appointed by Bomojo so long as the Bomojo Loan was outstanding;

> (iii)   The Debtor's second amended and restated operating agreement (the "Operating Agreement")(Exhibit A-2) provided that the consent of at least one manager appointed by Bomojo was always required in order to take any action, and that there could be no quorum for a meeting of the Debtor's board of managers unless RW Botnick was present; and

> (iv)    No guarantees of the Bomojo Loan by Debtor's members was required.

22.     Even though the Operating Agreement provided for management of the Debtor by its board of managers, Bomojo insisted, as part of the Bomojo Loan, that the Debtor enter into a management agreement (the "Management Agreement") with Bomojo, pursuant to which Bomojo, which was defined as a "manager" in the agreement, would be entitled to a

management fee of at least $200,000 annually once Debtor's EBITDA reached $1,500,000.  A copy of the Management Agreement is annexed as Exhibit A-3.

23.     Since the Bomojo Loan was for $800,000, the annual $200,000 minimum management fee would be equal to 25% of the total amount of the Bomojo Loan.  In other words, the combined amount due to Bomojo based upon its $800,000 "loan" would be at least 40% per annum, consisting of 15% interest under the Bomojo Loan Agreement plus the minimum 25% management fee.  Moreover, the failure of Debtor to make any payment under the Management Agreement constituted a default under the Bomojo Loan Agreement.

24.     While Bomojo was defined as a "manager" under the Management Agreement, it was not required to provide any services for its management fee under the Management Agreement, other than the services that it was already providing to the Debtor under the Operating Agreement through the Bomojo-appointed managers

## The Defendants' Fiduciary Duties to the Debtor

25.     Under the Florida Limited Liability Company Act, a manager owes a non-waiveable duty of loyalty to the limited liability company that it manages.

26.     Defendant RW Botnick, as the Chairman and a manager of the Debtor, owed a fiduciary duty to the Debtor.

27.     Defendant RS Botnick, as a manager of the Debtor, owed a fiduciary duty to the Debtor.

28.     Defendant Bomojo owes a fiduciary duty to the Debtor as a result of the facts that:  (i) Bomojo owns 19% plus warrants of up to an additional 6% of equity interests in the Debtor; (ii) Bomojo appointed three managers plus the independent manager to the Debtor's seven-person board of managers; (iii) Bomojo was a "manager" of the Debtor as set forth in the Management Agreement; and (iv) there existed a special relationship between the Debtor and

Bomojo because of the extensive control over the Debtor that was granted to Bomojo under the Bomojo Loan, and Bomojo was to receive a greater economic benefit under the Bomojo Loan than what a lender would receive from a typical transaction.

**Bomojo Refused to Provide Required Funding
Under The Bomojo Loan Unless the Debtor
Signed a Modification Which Allowed Bomojo
To Accelerate the Loan If the Debtor Took Any
<u>Action That Was "Not Acceptable to Richard W. Botnick"</u>**

29.     As required by the Bomojo Loan Agreement, Bomojo advanced the initial $550,000 to Debtor upon the closing of the Bomojo Loan.  However, shortly thereafter, Bomojo, through the actions of RW Botnick, and in breach of their fiduciary duties to the Debtor, refused to fund the second $250,000 advance, which was already required under the Bomojo Loan Agreement unless the Debtor agreed to enter into a side letter agreement (the "Side Letter Agreement")(Exhibit A-5) with Bomojo.  This Side Letter agreement provided that Bomojo could accelerate all monies due under the Bomojo Loan at any time if:

> (i) The Company, its officers or Managers take any action that is not acceptable to Richard W. Botnick, the current Chairman of the Managers of the Company, or his designee; or (ii) the Lender deems that any action of the Company, its officers or Managers renders the Lender insecure.

30.     There was no consideration received by the Debtor for making the crucial modifications contained in the Side Letter Agreement, which left the Debtor subject to the literal unfettered whim of RW Botnick and Bomojo, who could accelerate the Bomojo Loan at any time for any reason.  Bomojo was already required to fund the additional $250,000 to Debtor, no payments were yet due to Bomojo under the Bomojo Loan Agreement, there was no event of default under the Bomojo Loan, and no event of default had been called by Bomojo.  However, based upon Bomojo's utter refusal to fund the $250,000 unless the Side Letter Agreement was signed, the fact that Debtor needed the $250,000 for operations, and Debtor's only alternative

was expensive and drawn out litigation which it could not afford, the Debtor had no alternative other than to sign the Side Letter Agreement.  Moreover, since Debtor never had cash reserves of at least $800,000, it had no choice thereafter but to accede to the whims of Bomojo and RW Botnick because it would have been unable to repay the Bomojo Loan in full if Bomojo and RW Botnick followed through on their threats to accelerate the Bomojo Loan if any actions of the Debtor were not to RW Botnick's liking.  (Jaromin Dec. at ¶14).

31.    Following the execution of the Side Letter Agreement, Bomojo funded the $250,000 that it was already obligated to fund under the Bomojo Loan Agreement, and RW Botnick began exercising control over Debtor's cash-flow by exercising veto rights over Debtor's expenditures.  Simply put, there was no resemblance of a debtor-creditor relationship between Debtor and Bomojo – Bomojo, through RW Botnick was acting as an active member of Debtor's management with total control over Debtor's cash through a veto power.  Specifically, commencing in August 2014 and continuing thereafter, Bomojo and RW Botnick began exercising control over Debtor's cash-flow by seeking to reduce costs at the expense of the company's growth.  Their refusal to authorize expenditures resulted in Debtor laying off employees and scaling down operations.  Bomojo and RW Botnick also required Debtor to defer payroll to all senior members of management.  As a result, the Debtor's Director of Sales resigned.  During this period of time, RW Botnick's mantra was that if the Debtor's board of managers did not listen to his directions, "you will not like what I am going to do next," threatening to call a default under the Bomojo Loan, even though Debtor was in compliance with the terms of the loan.

32.    The first quarter of 2015 was a difficult quarter financially for all companies in the media industry.  Actual revenues fell short of projections for most companies in the industry.

Debtor was not an exception to the industry-wide slow down. While revenues lagged behind projections, Debtor remained current on its obligations to Newtek and Bomojo, which accounted for over 80% of the company's debt.

33.    Moreover, Debtor's management, other than Bomojo, made advances to the company in the first quarter of 2015 in the aggregate amount of approximately $30,000, which funds were deposited into Debtor's general operating account at Wells Fargo. These cash infusions were important to ensure Debtor had sufficient liquidity to continue to make payroll.

34.    Despite these cash infusions, Bomojo and RW Botnick continued to restrict the use of the company's cash flow during the first quarter of 2015, refusing the payment of such important items as payroll, insurance, satellite fees, closed captioning fees and other operational expenses. RW Botnick continued to reiterate that if Debtor did not follow his directions, he was going to call a default under the Bomojo Loan.

35.    While Debtor was also within 60 days on the payment of most trade debt (which accounted for only approximately 20% of its total debt), the Debtor opened lines of communications with certain trade creditors to modify payment terms in the short run, while Debtor sought to obtain receivable financing which would ensure that trade debt would continue to be paid during the time of the short industry-wide downturn.

36.    Thus, in February 2015, the Debtor negotiated a $241,000 pre-approved line of accounts receivable financing with American Express Merchant Financing ("American Express")(Exhibit A-6), pursuant to which American Express agreed that it would subordinate its proposed security interest in the Debtor's receivables so that it would be junior in priority to the security interests of both Bomojo and Newtek. This financing would ensure that the Debtor would have sufficient liquidity to continue to pay its trade creditors.

10

37.     However, on February 21, 2015, Bomojo, through its appointed board members RW Botnick and RS Botnick, acting in their roles as managers of Debtor, breached their fiduciary duties to the Debtor by exercising their veto power, refusing to consent to any accounts receivable financing, even though it was junior in priority to, and would not affect, Bomojo's liens on Debtor's property.

**Bomojo's Notice of Default Which Failed
To Point To Any Fact Constituting a Default, or
Any Loan Provision That Was Allegedly In Default**

38.     RW Botnick scheduled a telephonic meeting of Debtor's Board of Managers for March 4, 2015, which included the attendance of Bomojo's counsel.  When asked whether he was participating in the meeting as a member of Debtor's board of managers and its Chairman, or as a representative of Bomojo, RW Botnick refused to answer the question and Bomojo's counsel stated that it was "irrelevant."  At the meeting, RW Botnick and RS Botnick, who were two of the Bomojo-appointed managers, refused to permit the Debtor to enter into a receivable financing agreement with American Express, which would have ensured payments being made to the Debtor's unsecured creditors.

39.     Instead, at the March 4, 2015 manager meeting, RW Botnick, who claimed that the Debtor was in a "zone of insolvency," stated that the Debtor should liquidate, which would benefit no one other than Bomojo, which claimed a senior lien on accounts receivable.  A liquidation would result in no monies to unsecured creditors, and would harm Newtek, whose loan was current at the time.

40.     The Debtor's board of managers did not approve RW Botnick's request for liquidation.  Therefore, within 30 minutes of the conclusion of the March 4, 2015 board meeting, Bomojo, through RW Botnick, served a Notice of Default/Payment Demand signed by RW Botnick (the "Notice of Default")(Exhibit A-7) upon Debtor, which declared a default under

the Bomojo Loan.  While the Notice of Default generically alleges that the Debtor was in default

of its obligations under the Bomojo Loan, the Notice of Default failed to state a single event or

point to any provision of any of the Bomojo Loan documents which were allegedly in default.

41.     The Notice of Default came at a time when the Debtor was in compliance with all

of its obligations under the Bomojo Loan, including all payment obligations.  Thus, Bomojo and

RW Botnick breached their fiduciary duties to the Debtor by declaring a default which did not

exist.

42.     Following receipt of the Notice of Default, Marc Jaromin of Debtor telephoned

RW Botnick, requesting that he specifically identify the alleged default under the Bomojo Loan.

Incredibly, RW Botnick refused to tell Debtor what the alleged default was, or what provision of

the loan documents had allegedly been violated.

**Bomojo and RW Botnick's Opening of Bank Accounts
In Debtor's Name, Contacting the Debtor's Customers and Collecting
Receivables for the Benefit of Bomojo in Breach of it's Fiduciary Duties to Debtor**

43.     After declaring notice of an unspecified default under the Bomojo Loan

documents, RW Botnick RS Botnick and Bomojo breached their fiduciary duties to the Debtor

by taking steps to choke off the Debtor from all incoming cash and diverting such funds to

Bomojo.  Specifically, RW Botnick, without any authority from the Debtor's board of managers,

and with the aid of RS Botnick, opened a bank account at Bank of America in the Debtor's

name, using the Debtor's tax identification number.  RW Botnick was the only person who had

access to this account.  RW Botnick and/or RS Botnick then contacted the Debtor's customers

(typically customers that purchased advertising on Debtor's shows), and directed the customers

to send monies due to the Debtor directly to them in New Hampshire, where they would deposit

such funds into the account that RW Botnick unilaterally opened in Debtor's name.  Bomojo

and  RW  Botnick  and/or  RS  Botnick,  without  any  authority  from  the  Debtor's  board  of

managers, and in breach of their fiduciary duties to the Debtor, then caused such funds to be transferred to Bomojo, allegedly in payment of the Bomojo Loan.

44.        RW Botnick and Bomojo's actions with the aid and assistance of RS Botnick created an immediate cash flow problem for Debtor since, in breach their fiduciary duties to the Debtor, Bomojo RW Botnick and RS Botnick created a situation where Debtor did not have access to sufficient funds to pay its obligations, including payroll to its employees.

45.        Between March 4, 2015 and April 15, 2015, Debtor negotiated continuously with RW Botnick and Bomojo, looking for a solution where Bomojo would agree to allow the Debtor to use its cash flow to continue its business operations.  These discussions occasionally, albeit infrequently, led to Bomojo and RW Botnick consenting to the use of cash to pay employees and a few essential bills.  However, for the most part, Bomojo and RW Botnick in breach of their fiduciary duties to the Debtor prohibited the payment of trade payables, which resulted in an increase in trade payables during March and April of 2015.  In April 2015, in further breach of their fiduciary duties to the Debtor, RW Botnick and Bomojo told Debtor that they would not allow payroll and expenses to be paid unless Debtor agreed to pay $10,000 to Botnick or Bomojo, even though Debtor was not in default of its obligations under the Bomojo Loan, and such a payment was not required under the Bomojo Loan Agreement.  These actions were taken notwithstanding that by the beginning of April, the Debtor's revenues began increasing significantly, as the first quarter's industry wide downturn began to subside.

## The State Court Action and Writ of Garnishment

46.        On or about March 30, 2015, Bomojo commenced an action against the Debtor in the Circuit Court of Florida for the County of Orange, Ninth Judicial District (the "State Court Action")(Exhibit A-8), wrongly alleging that Debtor was in default of its obligations under the Bomojo Loan.

47.        On or about March 30, 2015, the court in the State Court Action entered an order granting Bomojo a pre-judgment writ of garnishment (Exhibit A-9).  Bomojo did not disclose to the state court that its manager, RW Botnick, was also the Chairman of Debtor's board of managers, or that the Debtor owed payroll to its employees due to Bomojo and RW Botnick's actions, or that Bomojo was a manager of the Debtor under the Management Agreement.

48.        It was approximately around this time that Debtor learned for the first time of the basis of the alleged defaults under the Bomojo loan.  Specifically, Bomojo asserted that there were two non-monetary defaults under the Bomojo loan.  First, Bomojo alleged that the Debtor was in default because its EBITDA, as defined in the Bomojo Loan Agreement, for the fourth quarter ending December 31, 2014 was not at least $75,000.  Second, Bomojo asserted that Debtor breached its obligations under the Bomojo Loan because the Debtor was not paying its debts when they came due.  There was not, and has not been, any allegation of any monetary default by the Debtor under the Bomojo Loan prior to the date of Debtor's bankruptcy filing.

49.        Bomojo's alleged allegations of the Debtor's default under the Bomojo Loan were false.  First, Debtor was required to have an EBITDA, as defined in the Bomojo Loan Agreement, of $73,166 for the fourth quarter.  However, Debtor actually had an EBITDA of $92,874.53 for the fourth quarter.(Exhibit A-11)  Bomojo and RW Botnick's declaration of a default under the Bomojo Loan Agreement when a default did not exist was a breach of Bomojo and RW Botnick's fiduciary duties to the Debtor.

50.        Moreover, to the extent that the Debtor could somehow have been considered not paying its debts as and when they came due, it was RW Botnick and Bomojo's fault that claims were not being paid.  RW Botnick was refusing to permit Debtor to pay many trade claims even though the Debtor was current on its obligations to Bomojo and not in default under the Bomojo

Loan. Moreover, when the Debtor was able to negotiate an accounts receivable financing line of credit with American Express, which would be junior in priority to the claims of Newtek and Bomojo, and would have resulted in sufficient available funds to pay trade claims, RW Botnick used his veto power to prevent Debtor from obtaining such financing. ( Jaromin Dec. at ¶34).

51.      Second, as of the date of the Notice of Default, the Debtor was paying its debts as and when they came due. As set forth earlier, the claims of Newtek and Bomojo make up 80% of the Debtor's obligations, and the Debtor was current on those obligations. With respect to the remaining 20% of claims, approximately half of those claims were being paid within 60 days, and with respect to the other half (which accounted for only approximately 10% of all claims against Debtor), payment plans were being negotiated between Debtor and the creditors and financing to pay such claims had been arranged with American Express.

### The April 2, 2015 Board of Managers Meeting

52.      A meeting of the Debtors' managers was held on April 2, 2015 (the "April 2015 Meeting") for the purpose of determining how the Debtor should proceed and react to the creditor enforcement actions being taken by Bomojo.

53.      In breach of their fiduciary duties to the Debtor, RW Botnick and RS Botnick failed to attend the meeting in an attempt to prevent a quorum of the Debtor's board of managers and/or prevent the Debtor from authorizing a bankruptcy filing or taking any other actions which would impede Bomojo's efforts to seize the Debtor's cash and receivables for their own benefit.

54.      Notwithstanding the absence of RW Botnick and RS Botnick at the April 2015 Meeting, the Debtors' board of managers approved a bankruptcy filing of the Debtor.

### The Closure of Debtor's Business and Bankruptcy Filing

55.      As a result of Bomojo's bad faith and inequitable conduct, Debtor was left

without any funds available to pay wages to employees, and Debtor closed its business on April 17, 2015.

56.     On April 30, 2015, Bomojo filed a motion (the "Receiver Motion")(Exhibit A-12) in the state court action for the appointment of a receiver.

57.     On May 1, 2015, the Debtor filed voluntary Chapter 7 bankruptcy petition with the Bankruptcy Court.

58.     The amount of claims against the Debtor pursuant to the Debtor's schedules of liabilities and the claim register in the Debtor's Chapter 7 case, are approximately $5,678,000.

59.     On May 22, 2015, Bomojo filed a motion (the "Bomojo Lift Stay Motion") with the Bankruptcy Court seeking relief from the automatic stay.

60.     On July 22, 2015, the Bankruptcy Court entered an order denying the Bomojo Lift Stay Motion.

61.     On September 3, 2015, Bomojo filed a proof of claim in the Debtor's bankruptcy case in the amount of $1,273,250.75 (the "Bomojo Claim").

**Count 1**
**Objection To Claim**
**(Against Defendant Bomojo)**

62.     The Trustee repeats and incorporates ¶¶ 1 through 61 of this Amended Complaint as if fully set forth herein.

63.     Section 502(b)(1) of the Bankruptcy Code provides that the Court shall allow a claim, except to the extent "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."

64.     The Bomojo Loan Agreement and Management Agreement both provide that they are governed by New York Law.

65.     Under New York Law, a loan which is criminally usurious is void *ab initio*, and

16

the lender is prevented from collecting either the principal or interest on such loan.

66.     Under New York Law, the defense of criminal usury may be asserted by a borrower which is a limited liability company pursuant to the N.Y. Limited Liability Company Act § 1104(c).

67.     The criminal usury rate under New York law is 25% per annum as set forth in New York Penal Law § 190.40.

68.     In determining whether a loan is usurious under New York law, courts have considered the following as interest:  (i) management or consulting fees; (ii) distributions of profits; (iii) commissions; and (iv) loan origination fees.

69.     Under New York law, the fact that the payment of a management fee, profit distribution or commission to a lender may be contingent upon a future event does not prevent such fee from being considered as interest for purposes of New York's usury statute.   In determining whether a loan is usurious, the Court will not consider whether or not the contingency has or has not occurred.

70.     The Loan Agreement provides for interest on the Bomojo Loan at 15% per annum.

71.     The Management Agreement provides that Bomojo shall be entitled to a management fee of not less than $200,000 once the Debtor's EBITDA reached $1,500,000.

72.     A management fee of $200,000 under the Management Agreement is equal to 25% of the principal balance ($800,000) of the Bomojo Loan.

73.     The amount payable to Bomojo under the Management Agreement constitutes interest for the purpose of New York's usury statute because:  (i) the management fee is tied to the Debtor's obligations under the Bomojo Loan Agreement because a breach of the payment

17

obligations under the Management Agreement constitutes a breach of the Bomojo Loan Agreement; and (ii) Bomojo was not providing any services to the Debtor under the Management Agreement other than those services the Bomojo-appointed managers of the Debtor were already obligated to provide to the Debtor under the Debtor's Operating Agreement.

74.     The Bomojo Loan is criminally usurious under New York Law because the interest payable to Bomojo, consisting of interest under the Bomojo Loan Agreement (15%) plus the management fee (at least 25%) exceed New York's 25% criminal usury rate. Accordingly, the Bomojo Loan and Bomojo Claim are not allowable, and the Bomojo Lien is also therefore not enforceable.

75.     The Trustee is entitled to a judgment expunging the Bomojo Claim and avoiding the Bomojo Lien.

**Count 2**
**Recharacterization Of Loan As Equity**
**(Against Defendant Bomojo)**

76.     The Trustee repeats and incorporates ¶¶ 1 through 75 of this Amended Complaint as if fully set forth herein.

77.     A loan made by an equity holder in a borrower may be recharacterized as a capital contribution when the borrower was initially undercapitalized or when the loan was made at a time when no other disinterested lender would have extended credit to the Borrower.

78.     Bomojo has been, since the time of the Bomojo Loan, an equity holder in the Debtor, as evidenced by its 19% ownership interest.  Additionally, under the Bomojo Loan, Bomojo also received warrants which would allow it to increase its ownership interest in the Debtor to 25%.

79.     Bomojo is an insider of the Debtor, as evidenced by the facts that:  (i) Bomojo's

18

manager, RW Botnick, is also the chairman of the Debtor; and (iii) Bomojo appointed three managers to the Debtor's board of managers and, while the Bomojo Loan was still outstanding, Bomojo also had the right to appoint the independent manager.

80.     Prior to obtaining the Bomojo Loan, the Debtor attempted but was unable to obtain financing.  The only funding available to the Debtor was from Bomojo, who insisted as part of such "loan," upon a 19% ownership interest in the Debtor, plus warrants which could increase its share in the Debtor to 25%.

81.     The Debtor has always been undercapitalized.  The Debtor's original business plan had called for $5,000,000 in financing for the business, but by the time of the Bomojo Loan, the Debtor was never able to come up with more than a $3,130,000 loan from Newtek (which replaced an earlier $2,500,000 bridge loan by Valley Bank) and approximately $560,000 in capital contribution by its other members.

82.     The Bomojo Loan has the characteristics of an equity investment.  Bomojo's manager, RW Botnick, was named Chairman of the Debtor.  Bomojo received the right to appoint three managers to the Debtor's board of managers, plus the independent manager so long as the Bomojo Loan is outstanding.  The Debtor's Operating Agreement provided that no action could be taken by Bomojo without the approval of at least one Bomojo-designated member to the Debtor's board of managers.  Bomojo was not permitted to hold a board of managers meeting unless Botnick or his designee was present.

83.     Bomojo's control over the Debtor was so pervasive that under the Side Letter Agreement, Bomojo could literally accelerate its $800,000 "loan" at any time if the Debtor took "any action that is not acceptable to Richard W. Botnick, the current Chairman of the Managers of the company."  Since the Debtor at no point had $800,000 in available cash, the threat of such

19

a default caused the Debtor to accede to virtually every whim of Bomojo and Botnick.

84.     Bomojo did not require, and the Bomojo Loan did not contain, any guarantees of the Debtor's other members.  It is unusual that a loan in the amount of the Bomojo Loan, which was junior in priority to Newtek's loan, except with respect to cash collateral, would not contain a guarantee of the debtor's members.

85.     Bomojo did not pay any cash consideration for its membership interest in the Debtor, other than its $800,000 "loan."  This establishes that the $800,000 was actually the price for Bomojo's acquisition of its membership interests.   This is also consistent with the pre-closing discussions between the Debtor and RW Botnick, where RW Botnick's cash infusion was originally discussed as an equity investment, because RW Botnick felt that the Debtor had too much debt.  It was only later, when RW Botnick informed the Debtor that his accountant had raised certain structural issues, that the financing was restructured as a loan.

86.     Accordingly, the Trustee is entitled to a judgment, recharacterizing the Bomojo Loan and Bomojo Claim as an equity investment in the Debtor and avoiding the Bomojo Lien.

### Count 3
### Equitable Subordination
### (Against Bomojo)

87.     The Trustee repeats and incorporates ¶¶ 1 through 86 of this Amended Complaint as if fully set forth herein.

88.     Bomojo has engaged in self-dealing and inequitable conduct with respect to the business affairs of the Debtor.

89.     Until shortly before the Petition Date, the Debtor was current on its obligations to Newtek and Bomojo, which together account for approximately 80% of the claims against the Debtor in this case.  The remaining approximately 20% of claims represent trade debt.  Half of these claims were within 60 days, and the Debtor had been negotiating terms of repayment with

the remaining creditors.

90.     The Debtor had arranged for accounts receivable financing, which would have allowed the trade claims to be paid, and the proposed financing would have been junior in priority to the secured claims of Newtek and Bomojo.  However, Bomojo, which held three seats on the Debtor's board of managers and veto rights over any actions of management, prohibited the Debtor from obtaining such financing.

91.     When Bomojo could not get the Debtor's board of managers to agree to liquidate the Debtor, Bomojo declared a "default" under the Bomojo Loan, but refused to tell the Debtor what actions constituted a default or what loan provisions had been violated.

92.     Bomojo, through the actions of Botnick, and purporting to utilize self-help remedies, then opened up a bank account in the Debtor's name, using the Debtor's tax identification number.  Bomojo contacted the Debtor's customers and directed them to send their payments directly to Botnick or Bomojo.  Thus, while sitting on the Debtor's board, Bomojo, through Botnick, took actions which deprived the Debtor from receiving cash, and prevented the Debtor from paying employees and essential vendors, so that Bomojo could recover such funds solely for its own benefit.

93.     The Debtor's creditors, vendors and employees, were harmed by Bomojo's self-dealing because instead of continuing operations whereby its secured creditors and employees would continue to be paid timely and its unsecured creditors would be paid through the receivables financing with American Express, Bomojo, by controlling and seizing the Debtor's incoming cash, forced the Debtor to close its business.  Bomojo's actions destroyed the company's going-concern value, prevented payment to employees and prevented both secured and unsecured creditors from recouping their claims.

94.     The equitable subordination of the Bomojo Claim and Bomojo Lien would not be inconsistent with the Bankruptcy Code.

95.     Accordingly, the Trustee is entitled to a judgment equitably subordinating the Bomojo Claim and Bomojo Lien below all other creditors in the Chapter 7 case, and its lien should therefore be disallowed.

**Count 4**
**<u>Turnover - 11 U.S.C. §542</u>**
**(Against Bomojo)**

96.     The Trustee repeats and incorporates ¶¶ 1 through 95 of this Amended Complaint as if fully set forth herein.

97.     The proceeds of pre-petition receivables of the Debtor (the "Proceeds") constitute property of the Debtor's estate under §541 of the Bankruptcy Code and property which the Plaintiff as the Chapter 7 Trustee of the Debtor is entitled to use, sell or lease under §363 of the Bankruptcy Code.

98.     Both prior and subsequent to the Petition Date, Bomojo collected Proceeds belonging to the Debtor.

99.     Bomojo holds Proceeds, in its own possession or in one or more accounts owned or controlled by Bomojo, or set up by Bomojo in the Debtor's name.

100.     Section 542 of the Bankruptcy Code provides that an entity that is in possession, custody, or control, during the case, of property that the Trustee may use, sell, or lease under §363 of the Bankruptcy Code shall deliver to the Trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

101.     The Plaintiff is entitled to a judgment requiring Bomojo to turn over the Proceeds to the Plaintiff.

**Count 5**
**Breach Of Fiduciary Duty**
**(Against All Defendants)**

102.    The Trustee repeats and incorporates ¶¶ 1 through 101 of this Amended Complaint as if fully set forth herein.

103.    Each of the Defendants owed a fiduciary duty, including a duty of loyalty, to the Debtor.

104.    The Defendants had a clear, irreconcilable conflict of interest.  Bomojo and the Bomojo-appointed managers of Debtor, including RW Botnick and RS Botnick could not fulfill their fiduciary duties to the Debtor, while simultaneously actively supporting Bomojo's efforts to seize the Debtor's cash and receivables and put it out of business.

105.    RW Botnick and RS Botnick wrongfully utilized their managerial positions at the Debtor to advance Bomojo's self-dealing agenda.

106.    Each of the Defendants chose to assist Bomojo in its pursuit of its purported remedies as a creditor of the Debtor, rather than seek solutions as managers and loyal members of Debtor.

107.    The diversion of all of the Debtor's income to accounts controlled by Bomojo and RW Botnick made it impossible for the Debtor to pay its vendors and employees which in turn forced the Debtor to close its business.  Thus, by wrongfully seizing the Debtor's revenue for itself, Bomojo, by and through the actions of RW Botnick and RW Botnick, caused the termination of the Debtor's business, damaging the Debtor and its creditors and employees.  As a result, the Debtor's creditors were left with little, if any, means to collect on their claims, and were therefore damaged by the Defendants' breaches of fiduciary duty.

108.    What is most egregious about this action is that Bomojo, along with RW Botnick and RS Botnick, in breach of their respective fiduciary duties to Debtor and its creditors, forced

23

the Debtor out of business by freezing and seizing its cash assets at a time when it was current on its obligations to over 80% of its creditors, including Bomojo.  Furthermore, these actions occurred after Debtor had arranged accounts receivable financing which was junior in priority to its largest creditors, Newtek Small Business Finance, LLC and Bomojo, which would have resulted in the payment of the Debtor's remaining claims.

109.    Accordingly, the Plaintiff is entitled to a money judgment in an amount of $5,678,000 plus punitive damages against the Defendants.

WHEREFORE, Plaintiff demands the entry of a judgment against Bomojo, RW Botnick, and RS Botnick: (i) expunging, recharacterizing as equity or equitably subordinating the Bomojo Claim; (ii) requiring Bomojo to turnover all Proceeds to the Plaintiff, and (iii) entering a money judgment against the Defendants in an amount of not less than $5,678,000 plus punitive damages.

/s/ Cynthia E. Lewis
Cynthia E. Lewis
Florida Bar No.      53076
James H. Monroe, P.A.
P.O. Box 540163
Orlando, FL 32854-0163
PH:    (407) 872-7447
Fax No. (407) 246-0008
Email: clewis@jamesmonroepa.com
Attorney for the Trustee